**SIGNED THIS: July 20, 2007**

_____
                                **THOMAS L. PERKINS**
              **UNITED STATES CHIEF BANKRUPTCY JUDGE**
_____

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| KIM E. PHILLIPS and MARY M. PHILLIPS, | ) | No. 05-87521 |
| | ) | |
| Debtors. | ) | |
| | ) | |
| | ) | |
| 1st FARM CREDIT SERVICES, PCA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Adv. No. 06-8123 |
| | ) | |
| KIM E. PHILLIPS and MARY M. PHILLIPS, | ) | |
| | ) | |
| Debtors, | ) | |
| | ) | |
| RICHARD BARBER, as Trustee of the Estate | ) | |
| of PHILLIPS FARMS, INC., COLCHESTER | ) | |
| STATE BANK, STATE BANK OF | ) | |
| AUGUSTA, DEERE AND COMPANY, | ) | |
| JOHN DEERE CREDIT COMPANY, | ) | |
| CNH CAPITAL AMERICA, LLC , | ) | |
| PAT RIGGINS, R. STEPHEN HUNT, and | ) | |
| BIRKEY'S FARM STORE, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**O P I N I O N**

Plaintiff, 1st Farm Credit Services, PCA ("FARM CREDIT"), instituted the current adversary proceeding to determine whether farm products, farm machinery, equipment, livestock, inventory, crops and proceeds are owned by the Debtors, Kim and Mary Phillips (individually referred to as "KIM" and "MARY" and jointly referred to as "DEBTORS"), or by a corporation formed by the DEBTORS called Phillips Farms, Inc. ("PFI") and to determine the extent, validity, and priority of various creditors' liens on such farm products, farm machinery, equipment, livestock, inventory, crops and proceeds. FARM CREDIT has filed a motion for partial summary judgment against one of the Defendants, the State Bank of Augusta ("AUGUSTA"), on Count I of its Second Amended Complaint.[1] For the reasons set forth herein, the motion will be denied.

**FACTUAL BACKGROUND**

The DEBTORS were married in 1986. In 1992, KIM began farming with his father-in-law, and in 1998, he acquired 40 acres of land and began farming on his own. Over time, KIM acquired more land and farm equipment, and eventually expanded his farming operations to farm on land leased from various landlords as well as his own land. MARY has worked for Western Illinois University for twenty years. In May of 2004, KIM wanted to separate the farming operation from their personal financial affairs so he decided to incorporate the farming operation in the name of PFI. With the assistance of an attorney,

---

[1] FARM CREDIT actually filed its motion for summary judgment based on the allegations contained in its First Amended Complaint, which was filed on September 15, 2006. While the motion for summary judgment was pending before the Court, FARM CREDIT obtained leave of Court and filed a Second Amended Complaint on February 16, 2007. Because the allegations in Count I of the Second Amended Complaint are identical to those in Count I in the First Amended Complaint, the Court will treat the motion for summary judgment as directed at Count I of the Second Amended Complaint.

2

the DEBTORS filed Articles of Incorporation for PFI with the Illinois Secretary of State on May 20, 2004.

To finance the farming operation over the years, the DEBTORS (and later PFI) established relationships with several lending institutions, including FARM CREDIT and AUGUSTA. From 2004 through 2006, FARM CREDIT made the following loans to KIM and MARY individually:

| DATE | AMOUNT |
|---|---|
| January 2, 2004 | $ 38,000 |
| March 17, 2004 | 20,000 |

These loans were secured by a security agreement dated December 8, 1999 signed by KIM and MARY individually covering (1) all crops growing or to be grown in Illinois during the term of the Security Agreement; (2) all harvested crops and all processed crops; (3) all livestock and poultry; (4) all feed, seed, fertilizer, insecticides, herbicides and other agricultural chemicals and supplies; (5) all equipment, spare parts and special tools for such equipment, all motor vehicles and all fixtures; and (6) all contract rights, chattel paper, documents, accounts, and general intangibles now owned or later acquired by the DEBTORS. To perfect its security interest, FARM CREDIT relied on a financing statement in the names of KIM and MARY PHILLIPS that had been filed with the Illinois Secretary of State on December 15, 1998, by FARM CREDIT'S predecessor in interest, Farm Credit Services of West Central Illinois (and continued on August 26, 2003) covering:

> All feed, seed, fertilizer, insecticides and other agricultural chemicals and supplies.

> All crops which are now, or during the term of the loan will become, growing on real estate and all harvested crops and all processed crops, whether or not produced by Borrower.

3

    All livestock and poultry.

    All equipment all spare parts and special tools for such equipment, all motor vehicles and all fixtures.

The financing statement also contained a legal description of the land upon which the crops were growing or to be grown. FARM CREDIT filed a second financing statement with the Illinois Secretary of State on February 25, 2000, in the names of KIM and MARY, which was continued on November 9, 2004, covering the same items of collateral as the December 15, 1998 financing statement.

    FARM CREDIT also made the following loans to "Phillips Farm, Inc." and the DEBTORS:

| DATE | AMOUNT |
|---|---|
| February 8, 2005 | $ 115,000 |
| February 8, 2005 | 250,000 |
| June 20, 2005 | 25,000 |
| June 28, 2005 | 20,000 |

The loan documentation was signed by KIM and MARY in their capacity as corporate officers and in their individual capacities. The above-listed loans were all secured by the December 8, 1999 security agreement signed by KIM and MARY individually as well as a new security agreement signed on February 8, 2005, by KIM and MARY individually and as officers of "Phillips Farm, Inc." covering the same collateral as described in the December 8, 1999 security agreement. By way of attempted perfection, FARM CREDIT filed a financing statement on February 18, 2005, identifying the Debtor as "Phillip Farm, Inc." Seven months later, on September 26, 2005, FARM CREDIT filed an amended

financing statement changing the name of the Debtor to "Phillips Farm, Inc." Two months later, on November 18, 2005, FARM CREDIT filed a second amended financing statement changing the name of the Debtor to "Phillips Farms, Inc." FARM CREDIT also relies on the December 15, 1998 and February 25, 2000 financing statements described above to perfect these loans as to KIM and MARY individually.

In 2004 and 2005, AUGUSTA made the following loans to KIM:

| DATE | AMOUNT |
|---|---|
| May 13, 2004 | $ 177,303 |
| January 3, 2005 | 30,000 |

The loan documentation for both loans was signed by KIM only. Each loan was secured by a separate agricultural security agreement signed by KIM corresponding to the date of the loan containing the following description of the collateral:

> All farm products, including without limitation: all (1) crops grown, growing, or to be grown, including crops produced on trees, vines and bushes, and agricultural goods produced in agricultural operations, (2) livestock, born or unborn, (3) supplies used or produced in farming operations, and (4) products of crops or livestock in unmanufactured states. All equipment, accessions, fixtures and general intangibles (including payment intangibles and software); instruments (including promissory notes), documents, deposit accounts, all attachments, accessories, tools, parts, supplies, increases, and all additions to, replacements of and substitutions for any of the property and goods, any insurance refunds on any of the foregoing property and goods; together with all products and proceeds of any of the property or goods. All records and data relating to any of the property and goods, in whatever form, and all equipment and software necessary to utilize, create, maintain, and process any such records and data on electronic media.

To perfect these loans, AUGUSTA relied on a financing statement filed with the Hancock County Recorder in KIM'S name only on March 26, 1992 (and continued on December 30, 1996) and a financing statement in KIM'S name only filed with the Illinois Secretary of State

on March 15, 2002, as an "in lieu of continuation" statement for the Hancock County financing statement. The March 26, 1992 financing statement covered:

> Equipment: All farm equipment now owned and hereafter acquired.
>
> Farm Products: All livestock, grain, crops and supplies now owned and hereafter acquired.
>
> General Intangibles: Proceeds from the sale of previously listed property.

The March 26, 1992 financing statement did not contain a description of the property upon which the crops were growing or to be grown.[2]

AUGUSTA also made the following loan to PFI in 2005:

| DATE | AMOUNT |
|---|---|
| March 1, 2005 | $ 100,020 |

The promissory note was signed by both KIM and MARY as officers of PFI. This loan was secured by an agricultural security agreement dated March 1, 2005, in the name of PFI signed by KIM and MARY as officers of PFI and containing the same description of the collateral as the May 13, 2004 and January 3, 2005 agricultural security agreements described above. To perfect this loan, AUGUSTA filed a financing statement in the name of "Phillips Farms, Inc." with the Illinois Secretary of State on March 10, 2005, containing the same word-for-word description of the collateral as in the agricultural security agreement. Apart from the crop ownership and the veil-piercing issues, FARM CREDIT does not challenge the form or sufficiency of this financing statement.

## PROCEDURAL BACKGROUND

The DEBTORS' bankruptcy saga began on September 12, 2005, when the DEBTORS filed a voluntary petition for relief under Chapter 12 of the Bankruptcy Code. Both FARM

---

[2] The current version of the Uniform Commercial Code – Secured Transactions that became effective July 1, 2001, does not require a financing statement that covers crops growing or to be grown to include a description of the real estate.

6

CREDIT and the Chapter 12 Trustee moved to dismiss the case because the amount of debt exceeded the then applicable $1,500,000 limitation set forth in the definition of "family farmer" under Section 101(18)(B) of the Bankruptcy Code, making the DEBTORS ineligible to be debtors under Chapter 12.[3] The DEBTORS responded that they had no objection to dismissal of the case without prejudice, and the case was dismissed on October 6, 2005.

While the DEBTORS' individual Chapter 12 case was pending, PFI filed a petition for relief under Chapter 12 on September 23, 2005. On November 2, 2005, after the DEBTORS' individual Chapter 12 case had been dismissed, FARM CREDIT filed a motion to dismiss PFI's Chapter 12 case, alleging that the assets and liabilities of KIM and MARY should be combined with those of PFI, because PFI failed to observe corporate formalities and KIM and MARY had commingled their personal assets with those of PFI to obtain financing. According to FARM CREDIT, after such consolidation, the aggregate debts of PFI, KIM and MARY exceeded the $1,500,000 limitation, and thus PFI was ineligible to be a debtor. Alternatively, FARM CREDIT asserted that PFI was a sham corporation with no assets and liabilities of its own. PFI responded that it had no objection to dismissal of the case without prejudice. On November 16, 2006, a dismissal order was entered.

On November 18, 2005, the DEBTORS filed a second voluntary petition for relief under Chapter 12 of the Bankruptcy Code. In their statement of financial affairs, in response to question #18, "Nature, location and name of business," the DEBTORS included a lengthy statement that KIM intended to be a farming corporation for 2005 and was in the

---

[3] Effective October 17, 2005, BAPCPA raised the aggregate debt limit for eligibility to qualify as a "family farmer" to $3,237,000.

7

process of transferring debts and assets to the corporation, but such transfers were not complete at the time of filing, etc. The statement also included the following:

> His purpose in establishing the corporation was not to deceive anybody, but rather to try to begin to divide his personal life and personal assets from his business life and business assets. To that end and because of the fact that he is personally liable, he has elected to file a chapter 12, listing not only his personal debts, but his corporate debts all on one schedule. The reason for listing those corporate debts is because most or all the creditors will claim that there was a co-mingling and there was no direct separation even though he attempted to set up a distinguishment [*sic*] between the corporate and the personal that probably had not been fully consummated. In addition it is obvious that Mr. Phillips does not distinguish or know the difference between corporate and personal because on his financial statements, it is obvious that he has included both corporate assets and corporate debt and jumbled it all together.

According to the DEBTORS' schedules, at the time of filing, the DEBTORS had approximately 9,500 bushels of beans in storage, either in bins or elevators, valued at approximately $54,150 ($5.70 per bushel) and approximately 31,000 bushels of corn in storage, either in bins or elevators, valued at approximately $55,180 ($1.78 per bushel). The crops were subsequently sold with Court approval, and the Chapter 12 Trustee and the attorney for AUGUSTA are holding proceeds from the sale of the 2005 crops.[4]

On March 1, 2006, PFI filed a Chapter 7 petition, listing as its asset a 1995 Volvo semi-tractor titled in the name of PFI with 501,000 miles valued at $4,000. PFI also listed several other assets, such as cattle, crops and equipment, along with a statement that these assets have "no value in this case, "since" Debtor believes all assets and debt belong in the personal bankruptcy case of Kim Phillips and Mary Phillips as the corporation was not

---

[4] According to a motion for distribution of payments filed by FARM CREDIT on March 29, 2007, the Trustee is holding approximately $169,363.74, which consists of $90,157.42 in adequate protection payments by the DEBTORS, $29,244.82 in proceeds from the sale of 2005 crops, $33,490.51 in proceeds from the sale of cattle, and $16,471.00 in farm payments from ASCS for 2005. According to the Trustee, the attorney for AUGUSTA is also holding additional proceeds from the sale of the 2005 crops.

8

properly established." On June 14, 2006, the Chapter 7 Trustee filed a notice of his intent to abandon all assets in the case except money, if any, in the Trustee's possession, and the Trustee's right "to exercise any avoidance powers, including the right to claim preferences and fraudulent transfers."

On May 5, 2006, FARM CREDIT instituted this adversary proceeding to determine the ownership of farm products, farm machinery, equipment, livestock, inventory, crops and proceeds and to determine the extent, validity and priority of liens. In Count I of FARM CREDIT'S complaint, FARM CREDIT seeks a determination that: (1) the DEBTORS own all farm products, inventory, crops and proceeds and (2) FARM CREDIT has the first priority lien on the DEBTOR'S farm products, inventory, crops and proceeds over the interests of AUGUSTA. In support of its allegation that the DEBTORS, as opposed to PFI, are the legal owners, FARM CREDIT asserts that, according to PFI's bankruptcy schedules, PFI and the Chapter 7 Trustee have no interest in the farm products, inventory, crops and proceeds. In support of its allegation that its lien has the first priority position, FARM CREDIT asserts that: (1) AUGUSTA'S 1992 financing statement was defective because it did not include a real estate description as required by the version of Section 9-402(1) in effect at the time the financing statement was filed; (2) the filing in Hancock County was ineffective with respect to crops grown in McDonough county; (3) AUGUSTA did not file a continuation statement with the Illinois Secretary of State until after FARM CREDIT'S filing; (4) MARY did not grant AUGUSTA a security interest in the crops; and (5) AUGUSTA has not provided any proof that it had an unterminated commitment and obligation to lend money to the DEBTORS at all times after 1992.[5]

---

[5] In Count I of the complaint, FARM CREDIT also sought a determination that its lien took priority over the lien claimed by Colchester State Bank, and the interest of Richard Barber, as Trustee for the Estate of Phillips Farms, Inc. (BARBER). However, in the parties' joint pretrial statement, Colchester conceded that it filed its financing statement

9

In its answer, AUGUSTA denied FARM CREDIT'S allegations and, as affirmative defenses, asserted: (1) AUGUSTA has the first priority lien on all farm products, farm machinery, equipment, livestock, inventory, crops and proceeds owned by KIM and MARY individually by virtue of a security agreement dated May 13, 2004, securing a promissory note of the same date in the amount of $177,303 and a promissory note dated January 3, 2005, in the amount of $30,000 and its 1992 financing statement, which was filed prior in time to any other claimant; (2) the 2005 crops and proceeds are owned by PFI and not KIM and MARY individually; and (3) AUGUSTA has a first priority lien on all farm products, farm machinery, equipment, livestock, inventory, crops and proceeds of PFI by virtue of a security agreement dated March 1, 2005, securing a promissory note with PFI of the same date for $100,020 and a financing statement filed with the Illinois Secretary of State's office on March 10, 2005.

FARM CREDIT moved for summary judgment against AUGUSTA on Count I of the complaint, asserting that the undisputed evidence shows that FARM CREDIT has a valid and perfected first priority lien on the 2005 crops and proceeds because (1) PFI was never a separate entity doing business apart from the DEBTORS and therefore the lien priority must be determined by perfected security interests granted by the DEBTORS individually, and (2) AUGUSTA is relying on a defective 1992 financing statement to perfect its security interest in the crops and proceeds. AUGUSTA asserts in response that (1) PFI should not be disregarded as a corporate entity, or alternatively, there exist material fact issues on this point, (2) AUGUSTA holds a properly perfected first priority lien on the 2005 crops and proceeds because it filed the first financing statement that correctly identified the Debtor

---

after FARM CREDIT with respect to the DEBTORS' farm products, inventory, crops and proceeds. A default judgment was granted in favor of FARM CREDIT against BARBER on July 6, 2006, leaving only FARM CREDIT and AUGUSTA asserting first priority liens on the 2005 crops and proceeds.

10

as "Phillips Farms, Inc."and (3) AUGUSTA also holds a properly perfected first priority lien on the 2005 crops and proceeds by virtue of its 1992 financing statement, which is not defective for failing to contain a land description because it refers to "crops" generally, thus including harvested crops or crops in storage. AUGUSTA also asserts that there are material fact issues regarding the extent of MARY'S interest in the 2005 crops and proceeds.

## MOTION FOR SUMMARY JUDGMENT

Summary judgment is properly granted when "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317,106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Summary judgment will be granted only where it is clear that there is no dispute about the facts or inferences to be drawn therefrom. *Central Nat. Life Ins. Co. v. Fidelity and Deposit Co. of Maryland*, 626 F.2d 537 (7th Cir. 1980). On a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party. *In re Chambers*, 348 F.3d 650 (7th Cir. 2003). The role of the court is not to weigh the evidence or to determine credibility, but only to determine whether there is a disputed, material fact for determination at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is "material" if, under the applicable law, it could have an effect on the outcome of the lawsuit. *JPM, Inc. v. John Deere Indus. Equipment Co.*, 94 F.3d 270 (7th Cir. 1996). The movant bears the burden to prove each fact

material to its claim and to establish that each fact is not in genuine dispute. If the movant fails to make that showing, summary judgment is not proper and must be denied. *In re Rogstad*, 126 F.3d 1224, 1227-28 (9th Cir. 1997).

In its motion for summary judgment, FARM CREDIT first asserts that PFI should be disregarded as a corporate entity because (1) beyond filing the Articles of Incorporation with the Illinois Secretary of State, no other corporate formalities were followed; (2) the funds and assets of PFI and the DEBTORS were commingled; and (3) the corporation was undercapitalized as no assets were transferred to the corporation (other than a single Volvo truck) and no capital was paid into PFI. In response, AUGUSTA asserts that the corporate entity should not be disregarded or, at the very least, there are fact issues regarding whether PFI should be disregarded as a corporate entity or seen as the alter ego of the DEBTORS.

## ANALYSIS

FARM CREDIT'S motion seeks partial summary judgment, only as to Count I and only as to AUGUSTA. The property that is the subject of Count I is described as the DEBTORS' "Farm Products, Inventory, Crops and Proceeds." Although never expressly identified in the pleadings, based upon the record before the Court, it appears that the property at issue on the motion before the Court is the 2005 crop and/or its proceeds, and the 2005 government program payments.

PFI was incorporated on May 20, 2004, and dissolved on October 2, 2006. It is undisputed that its Articles of Incorporation were properly executed and filed with the Office of the Illinois Secretary of State in accordance with 805 ILCS 5/2.10. By operation

of law, PFI was thus incorporated and its existence began. 805 ILCS 5/2.15. A corporation's existence continues until it is dissolved pursuant to Article 12 of the Business Corporation Act of 1983. 805 ILCS 5/12.30(a). Dissolution, however, does not effect a transfer of the corporation's assets. 805 ILCS 5/12.30(c). A dissolved Illinois corporation nevertheless retains legal title to its assets. *In re Lipuma,* 167 B.R. 522 (Bankr.N.D.Ill. 1994). A creditor that holds a security interest in corporate property does not lose its status as a secured creditor solely because the corporation has been dissolved. *ITT Commercial Finance Corp. v. Unlimited Automotive, Inc.*, 166 B.R. 637 (N.D.Ill. 1994).

FARM CREDIT'S position as to the 2005 crop appears to be twofold. First, that PFI did not own the 2005 crop because it never truly operated and second, that even if PFI did own the 2005 crop, the alter ego doctrine should be utilized to pierce PFI's corporate veil and to deem the 2005 crop to be owned by the DEBTORS, personally (or KIM, individually).

A corporation's operational status and its ownership of property are two different, largely unrelated, things. Whether it has ceased operating, indeed whether it ever began operation at all, a corporation has the power to own real and personal property. 805 ILCS 5/3.10(d). That power is not conditioned on the corporation being "operational." For example, if a corporation is formed to develop land and title to a parcel is conveyed to the corporation, but nothing further is done to develop it, the corporation nevertheless holds title to the real estate; lack of action does not result in divestiture.

If the DEBTORS had conveyed real estate or equipment to PFI but had done nothing else with the corporation, there would be no question as to ownership in PFI. One

difficulty here is that the asset in question, the 2005 crop, is not titled.  We cannot look at a deed or a certificate of title to identify the owner.  Instead, ownership must be inferred from the DEBTORS' intent and the surrounding circumstances.

The importance of intent on the question of ownership is paramount.  *See Johnson v. La Grange State Bank,* 73 Ill.2d 342, 359, 383 N.E.2d 185 (1978); *In re Estate of Mocny,* 257 Ill.App.3d 291, 630 N.E.2d 87 (Ill.App. 1 Dist. 1993); *Dan Pilson Auto Center, Inc. v. DeMarco,* 156 Ill.App.3d 617, 509 N.E.2d 159 (Ill.App. 4 Dist. 1987).  *See, also, In re Curtis,* 363 B.R. 572 (Bankr.E.D.Ark. 2007) (debtor farmer's intent that new partnership would conduct farming operation, coupled with partnership tax returns and other corroborating evidence, compelled conclusion that equipment, crops and crop proceeds were owned by partnership, not farmer, individually).

A second difficulty is that the asset in question, the 2005 crop, came into existence a year or more after PFI was formed.  Thus, this is not a question of whether an existing asset owned by KIM, individually, or by the DEBTORS, jointly, was validly conveyed to the newly formed corporation.[6]  Although a corporation's operational status and asset ownership are often unrelated, here, the asset at issue, the 2005 crop and its proceeds, constitutes the product of and the operational income generated by the farming activities.  If the 2005 farming operation was conducted by PFI, then PFI owns the crop.  So the issue is who farmed in 2005, KIM, personally, or PFI?

---

[6]In support of its position that PFI was undercapitalized, FARM CREDIT suggests that none of the preexisting farm personalty was transferred to PFI because KIM never produced a bill of sale or other document of conveyance.  It is far from clear, however, that a writing is necessary.  The Court is aware of no Illinois caselaw that makes a bill of sale the *sine qua non* of transferring ownership of untitled personal property.  It may well be that KIM'S intent that PFI would own the assets, coupled with their inclusion on the IRS depreciation schedules, is sufficient.

In support of its position that PFI never truly operated, FARM CREDIT relies upon the following facts:

1. No formal meetings of the shareholders or directors of PFI ever occurred.
2. No stock certificates were ever issued. (Disputed)
3. The DEBTORS were the incorporators.
4. The DEBTORS never paid in any capital. (Disputed)
5. The DEBTORS failed to transfer any assets related to the farming operation to PFI. (Disputed)
6. PFI never entered into any written leases for farm ground.
7. The DEBTORS' landlords in 2004 and 2005 were unaware of PFI's existence. (Disputed)

Other facts in the record contradict FARM CREDIT'S position and support PFI's operational status:

1. PFI existed as a legal entity from May 20, 2004 to October 2, 2006, a period which includes the entire crop year for 2005.
2. KIM testified that he intended the farming operation to be conducted by PFI in 2004 and 2005.
3. PFI filed tax returns for 2004 and 2005 in which all of the income and expenses from the farming operation for those years was attributed to PFI.
4. PFI elected to be treated as a Subchapter S corporation.
5. UAP's input loans in 2004 and 2005 were made to PFI.
6. PFI established, maintained and used three bank accounts in its own name.
7. The 2004 crop was sold in the name of PFI.
8. The 2005 government program payments were paid to PFI.
9. The 2005 expenses were paid in PFI's name.
10. PFI obtained loans, in its own name, from AUGUSTA and FARM CREDIT.
11. A 1099 was issued to PFI for custom work.
12. Though he failed to complete the paperwork to transfer most existing farm equipment to PFI, KIM intended PFI to be the owner of all farm related assets.
13. Most of the farm related assets were included on Schedule L attached to the 2004 and 2005 tax return.

In this Court's view, the evidence in the record overwhelmingly supports the conclusion that PFI validly conducted the farming operation in 2004 and 2005 and, therefore, is the owner of the crops and their proceeds for those years. The most important

factors that support this conclusion are KIM's intent that the farming operation be conducted by PFI, the corporation formed for that purpose, and PFI's filing of federal income tax returns. The fact that the DEBTORS and PFI have made statements to the contrary has no probative value. In the Court's view, those statements are nothing more than after-the-fact opinions that are erroneous. Because this matter is before the Court only on FARM CREDIT'S motion, the Court's ruling on this issue is necessarily limited to a finding that FARM CREDIT has failed to prove that KIM, personally, or the DEBTORS, together, own the 2005 crop and its proceeds.

Having reached the foregoing conclusion, the Court must next address FARM CREDIT'S invocation of the alter ego doctrine. The doctrine of "piercing the corporate veil" or disregarding the corporate entity is an equitable remedy under which a court may find a corporation's shareholders, directors or officers, who are not as a general rule liable for any corporate debts and obligations, personally liable for the corporation's debts and obligations. *Rosier v. Cascade Mountain, Inc.*, 367 Ill.App.3d 559, 855 N.E.2d 243, 250 (Ill.App. 1 Dist. 2006). The doctrine, purely equitable in nature, permits a court to pierce a corporation's veil of limited liability where observance of the fiction of separate identities would sanction a fraud or promote an injustice. *Sea-Land Services, Inc. v. Pepper Source*, 941 F.2d 519 (7th Cir. 1991); *In re Rehabilitation of Centaur Ins. Co.*, 158 Ill.2d 166, 172-73, 632 N.E.2d 1015 (Ill. 1994). The doctrine has traditionally been used to fasten liability on an individual who uses a corporation as an instrumentality to perpetrate a fraud or an injustice on third persons dealing with the corporation. *Rehabilitation of Centaur,* 158 Ill.2d at 173; *Rosier*, 367 Ill.App.3d at 565. Piercing of the corporate veil is not favored and the

power to do so is exercised reluctantly and cautiously. *In re KZK Livestock, Inc.*, 221 B.R. 471, 478 (Bankr.C.D.Ill. 1998) (citing *C M Corp. v. Oberer Development Co.*, 631 F.2d 536 (7th Cir. 1980)).

But FARM CREDIT calls upon the alter ego doctrine to pierce PFI's veil, not to hold KIM personally liable for PFI's debts, but to have property owned by PFI, its 2005 crop, deemed to have been owned by KIM.[7] In addition to this questionable purpose, FARM CREDIT, having made at least two loans to PFI, is simply not in a position to claim to have been defrauded or surprised by PFI's existence. *See Bankers Trust Co. v. Chicago Title & Trust Co.,* 89 Ill.App.3d 1014, 412 N.E.2d 660 (Ill.App. 1 Dist. 1980) (use of alter ego doctrine denied where third party was "fully cognizant" of the corporation's existence throughout the transaction). FARM CREDIT was not an unknowing third party defrauded by PFI's existence. Moreover, FARM CREDIT'S use of the doctrine is not for the purpose of righting an injustice as between it and the corporation's alter ego (i.e., KIM). Instead, the doctrine is sought to be used as a sword against another third party, AUGUSTA, to gain advantage in a lien priority dispute. An equitable remedy should not be used to perpetrate an inequity against another.[8]

FARM CREDIT'S reliance on the alter ego doctrine is necessitated by its concerns that it failed to properly perfect its lien against PFI. AUGUSTA also dealt with PFI and did perfect its lien. Because its transactions with PFI were flawed, FARM CREDIT asks the Court to throw out *both* its and AUGUSTA'S transactions with PFI, so that it may jump

---

[7] FARM CREDIT cites no case where a court has used the doctrine for the purpose of shifting ownership of property in this manner.

[8] FARM CREDIT fails to appreciate that veil-piercing is a common law remedy, wholly equitable in nature, that is entirely discretionary with the court, based on all of the circumstances and equities of the case.

over AUGUSTA'S priority in the 2005 crop. Not only is this request not "equitable" in any sense of the word, and thus not an appropriate justification for use of the alter ego doctrine, it is also directly at odds with Article 9's perfection and priority scheme, which is not subject to *ad hoc* revision for purported equitable reasons. *See I.N.S. v. Pangilinan,* 486 U.S. 875, 883, 108 S.Ct. 2210, 100 L.Ed.2d 882 (1988) (courts of equity can no more disregard statutory requirements and provisions than can courts of law); *Regional Airport Authority of Louisville v. LFG, LLC,* 460 F.3d 697, 711 (6th Cir. 2006) (where the rights of the parties are clearly defined by statute, equity follows the law and courts cannot disregard the statute). Both FARM CREDIT and AUGUSTA were fully aware of PFI's existence and purpose and intended to make loans to PFI as the entity conducting the farming operation. Since both lenders knowingly dealt with PFI, it is eminently fair for this dispute to be resolved with PFI's existence fully recognized. The priority rules of Article 9 will be applied as written to resolve this dispute between FARM CREDIT and AUGUSTA, as lenders who made loans to and obtained security interests from PFI.[9]

FARM CREDIT'S February 8, 2005 loans to PFI predate the single loan made by AUGUSTA to PFI. FARM CREDIT'S initial financing statement was also filed prior to AUGUSTA'S. Unfortunately for FARM CREDIT, the financing statement did not reflect PFI's correct name, identifying the Debtor as "Phillip Farm, Inc." AUGUSTA'S financing statement correctly identified PFI as "Phillips Farms, Inc."

A financing statement sufficiently provides the name of a debtor corporation "only if the financing statement provides the name of the debtor indicated on the public record

---

[9] AUGUSTA argues that FARM CREDIT'S failure to get PFI's name right means that FARM CREDIT'S loans must have been extended to some other corporation. All of the evidence in the record, however, indicates that FARM CREDIT intended to extend credit to PFI and, by mistake, simply misnamed the corporation in its loan documents.

18

of the debtor's jurisdiction of organization which shows the debtor to have been organized." 810 ILCS 5/9-503(a)(1). However, a financing statement that has minor errors may still be sufficient unless the errors make it seriously misleading. 810 ILCS 5/9-506(a). A financing statement that fails to provide the correct name, exactly, of a corporate debtor is seriously misleading, with one exception. 810 ILCS 5/9-506(b). The exception follows:

> If a search of the records of the filing office under the debtor's correct name, using the filing office's standard search logic, if any, would disclose a financing statement that fails sufficiently to provide the name of the debtor in accordance with Section 9-503(a), the name provided does not make the financing statement seriously misleading.

810 ILCS 5/9-506(c).[10]

If FARM CREDIT stipulates, or when the Court determines definitively, that PFI owns the 2005 crop, a question of material fact exists as to whether a UCC search using the correct name "Phillips Farms, Inc." would disclose FARM CREDIT'S financing statement filed under "Phillip Farm, Inc." using the standard search logic employed by the Illinois Secretary of State. If not, then FARM CREDIT'S financing statement filed February 18, 2005 was seriously misleading, and AUGUSTA'S security interest in the 2005 crop and its proceeds and the 2005 government program payments, owned by PFI, will be determined to be prior and superior to that of FARM CREDIT.

For these reasons, the motion for partial summary judgment filed by FARM CREDIT will be denied. This Opinion constitutes this Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. A separate Order will be entered.

###

---

[10] In addition, 810 ILCS 5/9-512(d) provides that a financing statement that is amended by an amendment that adds a debtor is effective as to the added debtor only from the date of the filing of the amendment.